# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MONTANA

# BILLINGS DIVISION

| | |
|---|---|
| KERI RUSSELL,<br><br>          Plaintiff,<br><br>vs.<br><br>DAIICHI-SANKYO, INC.,<br><br>          Defendant. | CV 11-34-BLG-CSO<br><br><br>**ORDER DENYING<br>DEFENDANT'S SUMMARY<br>JUDGMENT MOTION** |

Keri Russell ("Russell") claims that Daiichi-Sankyo, Inc.

("Daiichi") terminated her employment in violation of Montana's

Wrongful Discharge from Employment Act ("WDEA"), MCA § 39-2-901,

et seq. *Cmplt. (Court Doc. 4) at 1.* She asserts that Daiichi lacked good

cause to fire her and instead did so "in retaliation for reporting a

violation of public policy" respecting Daiichi's use of "Physician's

Opinions [and]  Discussions." *Id. at 4-5.* She seeks "[c]ompensatory

and consequential damages[,] ... economic and pecuniary damages, ...

and ... [p]unitive damages as allowed" by Montana law. *Id. at 6-7.*

On April 25, 2011, upon the parties' written consent, this case was

1

assigned to the undersigned for all purposes.  *Notice of Assignment to U.S. Magistrate [Judge] (Court Doc. 8)*.

Daiichi now moves for summary judgment.  *Deft's Mtn. for Summary Judgment (Court Doc. 19)*.  Having reviewed the parties' briefs and submissions, the Court will deny Daiichi's motion for the reasons discussed below.

## I.    **BACKGROUND**

Daiichi is a pharmaceutical company headquartered in Parsippany, New Jersey.  *Daiichi's Stmt. of Undisputed Facts (Court Doc. 21) at 2; Russell's Stmt. of Genuine Issues (Court Doc. 28) at 2*. Daiichi hired Russell on July 31, 2006, as a pharmaceutical representative.  *Court Doc. 21 at 2-3; Court Doc. 28 at 2-3*.

The parties disagree respecting the precise nature of Russell's job duties.  Daiichi, relying on Russell's deposition testimony, contends that Russell's job was to "sell pharmaceuticals."  *Russell Depo. (Court Doc. 21-1) at p. 16, ll. 4-5*.  Russell, relying on her declaration filed in opposition to Daiichi's summary judgment motion, states that her duties "involved calling on physicians and other health care providers

2

who had authority to prescribe medications ... [and] to inform [them] regarding the advantages of particular medications marketed by [Daiichi] and to promote the medications and encourage these physicians and other health care providers to prescribe them in their practice." *Russell Decl. (Court Doc. 27-1) at ¶ 8.*

Initially, Russell's territory was in Nebraska. *Id.* She received "pre-primary training" in Daiichi's regional office in Texas, and her progress in learning Daiichi's products was based on on-line testing. *Court Doc. 21 at 3; Court Doc. 28 at 3-4.*

In April 2007, Russell transferred to a newly-formed territory based in Montana. Her new District Manager was Andrie Leday ("Leday"). *Court Doc. 21 at 3; Court Doc. 28 at 4.* Two other Daiichi representatives worked in Russell's territory – Alisa Vandersloot and Erin Carse. Each representative was the primary seller of a different product. Russell was primary on a drug called Welchol®, secondary on Benicar®, and third on Azor®. Although the representatives sometimes worked together, each reported to a different manager. *Court Doc. 21 at 3; Court Doc. 28 at 4-5.*

As a representative, Russell had funds available to use for arranging speaker programs and so-called Physician Opinion and Discussion ("PODs") events. She set up, made arrangements for, and chose expert speakers from outside of the territory for the speaker programs. For the PODs, she was instructed to ask the physicians with the highest volume of prescriptions in the drug class that Daiichi was selling. She would ask the doctor to lead the discussion, and the discussion leader was paid. *Court Doc. 21 at 3-4; Court Doc. 28 at 5*.

The parties characterize the PODs somewhat differently. Daiichi maintains that PODs involved discussion among a group of health care providers about disease states and the drugs that treated them. *Court Doc. 21 at 3-4*. Russell maintains that the PODs were "nominally to deal with discussions of disease states to groups of health care providers, however, in reality the POD programs were often held with only one health care provider in the 'group' and that was sometimes a non-prescribing nurse." *Court Doc. 28 at 5*.

The administration of the programs was facilitated by third-party provider SCS Healthcare Marketing ("SCS"). A representative like

4

Russell would suggest a speaker who wrote a high volume of prescriptions in the class of drugs discussed, such as statins or hypertensive drugs.  Daiichi contracted with SCS and SCS had to approve the speaker and pay the speaker's fee.  *Court Doc. 21 at 4; Court Doc. 28 at 6.*  Russell maintains that if physicians wrote more prescriptions, they were offered more PODs and thus were paid more money.  *Court Doc. 28 at 7.*  Daiichi policy required POD leaders to be practicing health care providers "in the community with specific expertise in the relevant disease state."  *Court Doc. 21 at 4.*

According to the SCS Policy on Promotional Programs, the approved POD leader was required to train on Daiichi clinical information using approved materials.  Then he or she would lead a group discussion using questions prepared by Daiichi.  The parties discussed not only products but also disease states.  In exchange for this service, leaders were paid $600 per program.  *Court Doc. 21 at 4-5; Court Doc. 28 at 7-8.*

Daiichi representatives were ranked quarterly and annually based upon the percentage each person's sales exceeded his or her own

sales for the previous period or how much each had increased his or her market share.  Theoretically, then, a representative who had a terrible quarter could move up in the rankings if that person's next quarter was at all better.  *Court Doc. 21 at 5; Court Doc. 28 at 8-9.*

For the fiscal year ending March 30, 2008, Russell ranked 204th out of 500 sales representatives nationally and 28th out of 76 regionally.  *Court Doc. 21 at 5; Court Doc. 28 at 9.*  The parties dispute Russell's performance during fiscal year 2009.  Daiichi maintains that her performance deteriorated during this time as she ranked 377 out of 500 nationally and 57th out of 79 regionally on March 30, 2009.  Of nine representatives in her district, Russell ranked 9th.  *Court Doc. 21 at 5; Court Doc. 28 at 9-10.*

Russell disputes that her performance deteriorated during this time.  She maintains that Leday testified that the effects of the Sunshine Act of 2009 were being felt in 2009.  The Sunshine Act mandated transparency on compensation that physicians received from medical companies.  Some of the hospitals and healthcare providers, like Billings Clinic, became less accessible to sales representatives like

6

Russell.  *Court Doc. 28 at 9-10.*

Around June 30, 2009, Leday met with Russell to discuss her written fiscal year 2008 performance review.  *Court Doc. 21 at 5; Court Doc. 28 at 10.*  The parties disagree respecting some of the meeting's content.  Daiichi contends that Russell blamed her performance on lack of proper training on products and disease states and the loss of her training materials in a flood.  Daiichi claims that Leday arranged to send Russell a new set of materials and asked her to review them by September 1, 2009, but Russell failed to do so.  *Court Doc. 21 at 5-6.* Russell contends that she did review the materials, despite Leday's contention that she did not.  *Court Doc. 28 at 10.*

Also at this June 2009 performance review meeting, Daiichi contends that Leday urged Russell to use "objection handlers" developed by Daiichi, but that Russell did not use "very many of them." *Court Doc. 21 at 6.*  Russell contends that she reviewed the materials and "used them as suggestions" but indicated the "canned responses don't go over very well" and, although they were a great resource, she did not use very many of them verbatim.  *Court Doc. 28 at 12.*

The parties agree that Russell testified at her deposition that, while they were going over her performance review, she told Leday that she thought "it was wrong to say that if a physician is not writing the product that they are getting paid to speak on, that we should find another physician who would write." She did not say that the practice was illegal. She did not know at the time that it was illegal. Russell responded to questioning at her deposition as follows:

Q    So you said it was wrong. Did you say it was illegal?

A    At that time I did not know that it was illegal.

Q    Did you do any research subsequent to see if it was legal or –

A    I have googled and looked into it.

Q    Not since your lawsuit.

A    I looked into since my termination.

Q    Prior to your termination?

A    At that time, no.

Q    So you just told him you thought it was wrong?

A    Yes.

*Court Doc. 21 at 6-7; Court Doc. 28 at 12-13.*

8

During her deposition testimony, Russell added that the PODs

issue "initially came about when I had approached a physician about

becoming a POD leader.  She told me that she felt that it was unethical

to accept money. ... she wanted the money to go directly from [Daiichi]

to a local charity.  I presented that to Andrie [Leday], and he said,

'That defeats the purpose of the POD.'" *Court Doc. 28 at 13-14.*  Russell

presented this issue to Leday "far prior" to her evaluation in June 2009.

*Russell Depo. (Court Doc. 21-1) p. 181, ll. 2-6.*

The parties agree that the written performance review was

completed before Russell reviewed and signed it on June 30, 2009.  She

had the opportunity to submit her own written comments to the

performance review, but failed to do so "after more than one request."

*Court Doc. 21 at 7-8; Court Doc. 28 at 14-15.*

The parties disagree respecting Russell's concerns about the POD

programs and about when she mentioned her concerns to Leday.

Daiichi maintains that Russell contends that she mentioned her

feelings about POD programs to Leday one other time approximately

three months later during a break at a meeting in Denver in September

9

2009.  At that time, she "just told him it was wrong."  *Court Doc. 21 at 8*.  She did not share her concerns with anyone else, nor did she make any other complaints to Leday.  *Id*.

Russell argues that Daiichi paraphrased her testimony and that her actual deposition testimony better reflects her position.  In response to questioning, she stated:

Q    Okay.  Tell me about the second time you made your complaint.

A    I had come back from getting a green tea at Starbucks, and he was standing outside; and he had said earlier that day, if your physicians are not writing – if your POD leaders are not writing your prescriptions, you need to get new POD leaders.  And I just – it is wrong.  It is just wrong.

Q    And you told him it was wrong?

A    Yes.

Q    Anything else?

A    Just told him that it is wrong.

Q    And his response was?

A    "The company gives us this to use, so we better use it."

10

Q     And that was the end of that discussion?

A     Yes.

*Court Doc. 28 at 16.*

The parties agree that there is no documentation reflecting any objections made by Russell to POD programs and no witness, other than Russell, who can testify that they were made.  Leday denies that these conversations regarding POD programs ever occurred.  *Court Doc. 21 at 8; Court Doc. 28 at 16-17.*

The parties disagree respecting POD programs held in December 2009.  Daiichi, relying on Russell's deposition testimony, contends that Russell "arranged for and participated in three POD programs in December 2009.  She wrote summaries of these programs noting that the participants discussed third-party reports, disease states, case studies and treatment options.  In two instances the presenters were physicians.  The third was a physician's assistant." *Court Doc. 21 at 8-9 (citing Russell Depo. (Court Doc. 21-1) at p. 115, ll. 15-25; 116, ll. 4-6; and Depo. Ex. 20).*  Russell, relying on her declaration filed in opposition to Daiichi's summary judgment motion, states that at one of

11

the POD programs in December 2009, "about five minutes of the two hours mentioned were actually spent on the JNC topic – the rest was social conversation among attendees."  *Court Doc. 28 at 17 (citing Russell Decl. (Court Doc. 27-1) at ¶ 19).*

The parties agree that:

(1) Russell was aware of Daiichi's complaint procedure and compliance hotline where employees could confidentially report "suspected violations" of policy, law, or regulations or "irregularities.". . Russell never used this policy to complain about POD programs.  *Court Doc. 21 at 9; Court Doc. 28 at 17-18.*

(2) After her termination, Russell applied for Unemployment Insurance benefits.  She did not mention that she felt she had been discharged because of her complaints about the POD programs.  *Court Doc. 21 at 9; Court Doc. 28 at 18.*

(3) On March 28, 2008, March 29, 2009, and October 18, 2009, Russell filled out on-line positive evaluations of Leday.  On October 18, 2009, for example, she said, "He is very positive and shows a great deal of passion in helping us improve.  He is very well informed with what is

12

going on in the market and passes that on to his team. ... he is an

amazing resource for information." When asked to identify

competencies that Leday should stop using, she responded, "I can't

really think of anything." *Court Doc. 21 at 9-10; Court Doc. 28 at 18-19.*

The parties disagree somewhat respecting Leday's September 9,

2009, trip to Montana when he evaluated Russell. Daiichi maintains

that Leday flew to Montana and accompanied Russell on her calls. He

provided her with a report evaluating her performance. His evaluation

noted that she lacked "basic and necessary knowledge" to do her job

effectively. He discovered that she had not reviewed the materials he

had sent her three months earlier. Again he asked her to review the

training CDs and to write a summary of each by September 25th. He

warned her "that if this deficiency is not corrected by our next

scheduled field visit that progressive discipline will be utilized in the

form of a formal coaching action plan." *Court Doc. 21 at 10.*

Russell maintains that Leday did not accompany her on calls but

rather followed her. Leday was not allowed to enter the premises with

Russell on some of the calls where the healthcare providers had a "no

13

managers allowed" policy. *Court Doc. 28 at 19-20.*

The parties also disagree respecting Leday's next encounter with Russell. Daiichi maintains that, shortly after Leday's Montana visit, Russell and Leday attended a quarterly meeting in Denver at which Russell was not fully prepared. Leday sent her an email regarding her lack of preparation, but urged her to "buckle down" and to use her "selling skills to the fullest." *Court Doc. 21 at 10.* Russell maintains that, although it is true that Leday sent her an email making these accusations, the email was "blind copied" to Human Resources' Ms. Crisci ("Crisci"). Leday was told to blind copy any negative emails to Crisci. The email was sent on September 16, 2009, after Russell had complained about the PODs. *Court Doc. 28 at 21.*

Leday accompanied Russell again on October 14 and 15, 2009. He was critical of her pre-call planning and her failure to use her promotional budget. She was late completing her previous assignment. *Court Doc. 21 at 11; Court Doc. 28 at 21-22.*

The parties agree that on October 15, 2009, Leday placed Russell on a 90-day performance improvement plan, listing all of the

14

deficiencies in Russell's performance over the past six months.  He noted that before the end of the year, she would be tested on the two products she promoted and would be expected to score at 90% or better. He offered to assist her in improving her performance. *Court Doc. 21 at 11; Court Doc. 28 at 21-22.*

On December 9 and 10, 2009, Leday again came to Montana to work with Russell.  As promised in October, he administered the on-line tests for Welchol® and Benicar®.  Russell admitted she was not prepared because she lacked training materials.  She said she had left a note for the training manager during the first part of November, but never heard back. *Court Doc. 21 at 11; Court Doc. 28 at 22-23.* Although Daiichi maintains that Russell did not make any other effort to obtain the materials, *Court Doc. 21 at 11*, Russell maintains that she searched the website with Leday and the materials were not there. *Court Doc. 28 at 22-23.*

On December 9, 2009, Russell and Leday located materials on line and Leday gave Russell time out of the field to study for the tests.  She failed both tests with a score of 67%. *Court Doc. 28 at 23-24.*

15

The parties also disagree somewhat respecting Leday's next field visit on January 27 and 28, 2010.  Daiichi maintains that, while she had improved in some areas, Russell was admittedly late for her meeting with Leday.  She said she "texted" Leday but did not attempt to call him.  She stated that her snow tires were balding, and she didn't want to drive on icy roads in the dark.  Leday checked her tires and did not find her excuse credible.  *Court Doc. 21 at 12.*

Russell disputes Daiichi's characterization.  She maintains that she tried to text Leday because "[s]ometimes texts will go through where a phone call will not."  She maintains that she also testified that she was not late because the tires were balding but more  because of driving on potentially icy roads before daylight.  *Court Doc. 28 at 24.*

The parties agree that on February 18, 2010, Russell went to Salt Lake City to meet with Leday and his manager, Britt Manning ("Manning").  The purpose of the meeting was to place Russell on final warning.  Once again, she was given a letter outlining the deficiencies in her performance.  She was asked again to provide pre- and post-call reports.  The letter stated that "[f]ailure to show immediate and

sustained improvement can result in further disciplinary action up to, and including, termination." *Court Doc. 28 at 25*.

In March 2010, Leday made another trip to work with Russell. Russell re-took the product tests and failed again. Leday found that Russell was not progressing in several areas. After failing the tests for a second time, Russell asked if she was going to be fired. Leday told her that it was not his call. *Court Doc. 21 at 13; Court Doc. 28 at 25-26*. Russell did not think she was going to be fired. *Court Doc. 28 at 25-26*.

The parties disagree respecting Russell's termination from employment. Daiichi maintains that Leday consulted with his manager and with Daiichi Human Resources. The decision was made to terminate Russell's employment due to her continuing failure to correct her performance deficiencies. *Court Doc. 21 at 13*. Russell maintains that she was fired not because of performance issues but because of issues unrelated to her performance and for complaining to Leday about the POD program. *Court Doc. 28 at 26-27*.

The parties agree that, on March 28, 2010, Leday notified Russell that he would be coming to Montana to meet with her the next day.

17

That same day, Russell went to her physician and obtained a note saying she would be off work for "at least 30 days." At this point, Russell ceased opening her emails and made a claim for short-term disability, which was later denied. On March 19, 2010, Russell was notified by letter that her employment had been terminated. *Court Doc. 21 at 13-14; Court Doc. 28 at 27-28.*

Finally, the parties disagree respecting Russell's contentions as to why she was fired. Daiichi maintains that Russell contends that her performance was satisfactory and that "the only reason" she was fired was because she told Leday that the way POD leaders were chosen was "wrong." *Court Doc. 21 at 14.* Russell disputes this and maintains that she was fired not only for telling her supervisor that she thought the POD programs were wrong, but also because she refused to do them. Russell further contends that Leday admitted criticizing her for "not doing enough PODs ...." *Court Doc. 28-1 at 1.*

II.   **DISCUSSION**

    A.   **Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows

18

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable fact-finder to return a verdict for the nonmoving party.   *Id*.

Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp.*, 477 U.S. at 322.  "A moving party without the ultimate burden of persuasion at trial – usually, but not always, a defendant – has both the initial burden of production and

the ultimate burden of persuasion on a motion for summary judgment."
*Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099,
1102 (9th Cir. 2000). "In order to carry its burden of production, the
moving party must either produce evidence negating an essential
element of the nonmoving party's claim or defense or show that the
nonmoving party does not have enough evidence of an essential
element to carry its ultimate burden of persuasion at trial." *Id.*

If the moving party meets its initial responsibility, the burden
then shifts to the opposing party to establish that a genuine issue as to
any material fact actually does exist. *Matsushita Elec. Indus. Co. v.
Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to
establish the existence of this factual dispute, the opposing party may
not rely upon the denials of its pleadings, but is required to tender
evidence of specific facts in the form of affidavits, and/or admissible
discovery material, in support of its contention that the dispute exists.
Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586, n.11. Again, the
opposing party must demonstrate that the fact in contention is
material, *i.e.*, a fact that might affect the outcome of the suit under the

governing law, *Anderson*, 477 U.S. at 248; *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F .2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, *i.e.*, the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Anderson*, 477 U.S. at 248 ("summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita*, 475 U.S. at 587 (quotation omitted).

In resolving a summary judgment motion, the Court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The

21

evidence of the opposing party is to be believed, *Anderson*, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the Court must be drawn in favor of the opposing party, *Matsushita*, 475 U.S. at 587 (citation omitted).

Finally, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

### B.   <u>Parties' Arguments</u>

Daiichi, seeking summary judgment on Russell's claims, advances two principal arguments. First, Daiichi argues that it did not discharge Russell for reporting a public policy violation. *Daiichi's Br. in Support of Mtn. for Summary Judgment (Court Doc. 20) at 4-11.* Daiichi notes that Russell contends it violated MCA § 37-2-102(3) when Leday told Russell to nominate those medical care providers who prescribed Daiichi products to be paid presenters for POD programs. The statute provides:

It is unlawful:

*       *       *

(3) * * * for a drug company to pay or to promise to pay to a medical practitioner any rebate, refund, discount, commission, or other valuable consideration for, on account of, or based upon the volume of wholesale or retail sales, at any place, of drugs manufactured, processed, packaged, or distributed by the company.

MCA § 37-2-102(3).

Daiichi notes that Russell maintains that she twice told Leday that it was wrong for her to nominate those medical care providers who prescribed Daiichi products to be paid presenters for POD programs. Daiichi argues that Russell:  (1) never told Leday why she believed it was wrong; (2) never complained to anyone else about the POD programs; (3) did not know of any law prohibiting the practice until after she was fired; (4) never reported the practice under Daiichi's complaint procedure and compliance hotline even though she was aware of Daiichi's policy for employees to do so; (5) did not write her concerns about the program on her performance review; (6) did not mention the POD programs in the explanation she provided when she applied for state unemployment benefits; (7) is not a "whistle blower"

23

entitled to the WDEA's protection because she did not know about the law that she contends Daiichi violated when she made her reports to Leday, and (8) did not report to someone other than the party she believed was committing the "wrong." *Court Doc. 20 at 5-9.*

Daiichi also argues that: (1) its practice of paying medical providers, arranged through third-party SCS, for leading POD program discussions does not violate MCA § 37-2-102(3) as Russell suggests, *id. at 9-10*; and (2) MCA § 37-2-102(3) does not apply because it was enacted to ensure that doctors in Montana do not own pharmacies, which is not at issue in this case, *id. at 10-11*.

Second, Daiichi argues that it fired Russell for good cause. *Id. at 11-18.* It argues that there is objective evidence of record of Russell's unsatisfactory performance, and Russell cannot present evidence that the reason Daiichi fired her was merely a pretext, and not the true reason for her discharge, because no such evidence exists. *Id. at 12-14.*

Daiichi also argues that Russell is unable to prove that her job performance was satisfactory. *Id. at 15.* It argues that there is undisputed evidence demonstrating that Russell's poor performance,

24

including her supervisor's attempts at corrective action and critical performance reviews, pre-dates her alleged comments regarding the POD program. *Id. at 15-16.* Daiichi argues that it, and not Russell or the Court, must decide whether her performance was satisfactory and it has determined that her performance was deficient. *Id. at 16.* It argues that Leday worked with her to improve her job performance, but those efforts failed. Despite Leday's efforts, Daiichi argues, Russell failed to satisfactorily perform her job duties. *Id. at 17-18.*

In response, Russell argues that Daiichi did not have "good cause," as defined in the WDEA, to fire her. *Russell's Resp. Br. (Court Doc. 27) at 18-19.* She argues that she "was a successful pharmaceutical representative," and points to statements in her sworn declaration that: (1) she "consistently ranked in the middle of [her] district according to Year-to-Date (YTD) rankings[,]" *Russell Decl. (Court Doc. 27-1) at ¶ 32;* (2) others who ranked below her were not put on performance plans as she was, *id. at ¶ 34;* (3) she was not aware of any performance problems before 2009, *id. at ¶ 35;* (4) she was voted by others in her district as "best role-play detailer in September of 2009

25

during training in Denver, Colorado[,]" *id. at ¶ 37*; (5) she won the "Run for a Billion Contest and the Drive for a Billion Contest," and was awarded a competitive internship in March 2008, *id. at ¶ 38*; and (6) she was the only one in her district chosen in November 2009 to attend American Society of Hypertension training, *id. at ¶ 39*.  This evidence, she argues, raises genuine issues of material fact that preclude summary judgment in Daiichi's favor on her claim that her discharge was wrongful.

Russell also argues that her discharge from employment "was in retaliation for her complaints about [Daiichi's] POD program and her refusal to continue scheduling the PODs because of her recognition that the physicians were being paid for the sham events as an incentive to increase their prescriptions of [Daiichi's] pharmaceutical products."  *Id. at 22*.  She notes that she testified that she complained to her district manager, Leday, that the POD programs were wrong.  And, she argues that she stated in her sworn declaration that "she felt the PODs were unethical and immoral, and although she thought the POD program violated federal 'kick-back' laws, she lacked the ability to research the

26

issue, and only found the specific statutory support for her complaints and refusal to schedule the PODs after she was terminated." *Id.* Thus, she argues, genuine issues of material fact preclude Daiichi's summary judgment motion to the extent it relates to this issue. *Id. at 25.*

In reply, Daiichi argues that Russell cannot provide proof to satisfy the elements of her retaliatory discharge claim. *Daiichi's Reply Br. (Court Doc. 36) at 3-7.* It argues that: (1) Russell did not intend to report a violation of public policy because she did not say why she thought the policy was "wrong" nor did she know of any law being broken that would allow her report to be characterized as being made in good faith, *id. at 3*; (2) Russell has not and cannot provide evidence showing that paying health care providers $600 to lead discussions on diseases and pharmaceuticals violates MCA § 37-2-102(3), *id. at 4*; (3) Russell cannot and has not shown that she intended to expose an illegality by telling Leday she thought the POD program was wrong but rather was simply telling her manager why she failed to schedule POD programs, *id. at 5*; (4) Russell cannot prove her complaints about the POD program caused her termination, *id. at 5-7*; (5) she cannot produce

27

evidence that her job performance was satisfactory, nor can she show

that Daiichi's reasons for firing her were pretextual, *id. at 7-8*; (6)

Russell is not permitted to attempt to create fact issues by

contradicting her deposition testimony with statements in a declaration

filed with her brief in opposition to Daiichi's summary judgment

motion, *id. at 9-12*; and (7) the disputed issues that Russell has

identified are not sufficiently genuine or material to preclude summary

judgment, *id. at 12-15*.

### C.   <u>Analysis</u>

An employee bears the burden of proving wrongful discharge.

*Delaware v. K-Decorators, Inc.*, 973 P.2d 818, 829 (Mont. 1999)

(citations omitted); *Schwartz v. Metro Aviation, Inc.*, 2009 WL 352599,

at *4 (D. Mont. 2009) (citing *Becker v. Rosebud Operating Services, Inc.*,

191 P.3d 435, ¶ 24 (Mont. 2008)).

The WDEA provides:

A discharge is wrongful only if:

(1)   it was in retaliation for the employee's refusal to violate
      public policy or for reporting a violation of public policy;

(2)   the discharge was not for good cause and the employee had

completed the employer's probationary period of employment; or

(3)     the employer violated the express provisions of its own written personnel policy.

MCA § 39-2-904(1).

Montana law defines "good cause" as "reasonable job-related grounds for dismissal based on failure to satisfactorily perform job duties, disruption of the employer's operation, or other legitimate business reason."  Mont. Code Ann. § 39-2-903(5).  "A 'legitimate business reason' is 'a reason that is neither false, whimsical, arbitrary or capricious, and it must have some logical relationship to the needs of the business.' " *Delaware*, 973 P.2d at 829 (quoting *Buck v. Billings Montana Chevrolet*, 811 P.2d 537, 540 (Mont. 1991)).

The plaintiff ultimately has the burden of proving a claim.  But when a summary judgment motion is at issue in a case involving a WDEA claim, the employer, as the moving party, bears " 'the burden of establishing there [are] no issues of material fact regarding good cause [ ... ] entitling [the employer] to judgment as a matter of law.' " *Schwartz*, 2009 WL 352599, at *4 (quoting *Arnold v. Yellowstone*

29

*Mountain Club, LLC*, 100 P.3d 137, ¶ 24 (Mont. 2004)).  When an

employer satisfies this initial burden, the employee can survive

summary judgment on the good cause issue by "either prov[ing] that

the given reason for the discharge is not 'good cause' in and of itself, or

that the given reason is a pretext and not the honest reason for the

discharge." *Id.* (quoting *Becker*, at ¶ 24 (internal quotations and citation

omitted)).  A court may grant summary judgment, however, if the

nonmoving party fails to present any evidence identifying a genuine

issue of material fact respecting the WDEA claim.  *Id.* (citing *Arnold*,

100 P.3d 137, ¶ 26).

In considering a WDEA claim, the Court "must balance an

employer's right and discretion to determine who it will employ and

who it will retain in employment against the employee's legitimate

interests to secure employment." *Id. (citing Vettel-Becker v. Deaconess*

*Medical Center of Billings, Inc.*, 177 P.3d 1034, ¶ 38 (Mont. 2008)

(citing *Buck*, 811 P.2d at 540)).  "The balance should favor an employee

who presents evidence, and not mere speculation or denial, upon which

a jury could determine that the reasons given for his termination were

30

false, arbitrary or capricious, and unrelated to the needs of the business." *Id.* (citing *Johnson v. Costco Wholesale*, 152 P.3d 727, ¶ 23 (Mont. 2007) (citation omitted)).

Having considered the foregoing authority and the entire record, the Court concludes that genuine issues of material fact preclude summary judgment in Daiichi's favor on Russell's claims.

Respecting Russell's retaliation claim, genuine issues of material fact exist about whether Daiichi's POD programs fall within MCA § 37-2-102(3)'s restrictions and whether Russell's complaints to Leday that the PODs were "wrong" amounted to "reporting a violation of public policy" as contemplated in MCA § 39-2-904(1)(a).

First, the current record is unclear as to whether Daiichi's POD programs violate MCA § 37-2-102(3).  Evidence upon which the parties rely characterizes the POD programs differently.  Daiichi maintains that "each [POD] speaker provided services in exchange for the fee" and that it is "more than reasonable to assume that a busy professional would expect to be compensated for taking time out of his or her life to review training materials and lead a discussion." *Court Doc. 20 at 9*

31

(citing *Leday Depo. at p. 196, ll. 17-19*).  This arrangement, Daiichi

argues, makes MCA § 37-2-102(3) inapplicable because the statute was

really intended only to make it illegal for doctors to own pharmacies.

*Id. at 10-11.*

Russell, on the other hand, testified at her deposition that she and

other Daiichi pharmaceutical representatives "were instructed to ask

the physicians with the highest volume, the ones that would have the

greatest amount of impact on our business" in terms of writing the

most prescriptions for drugs in certain drug classes sold by Daiichi, to

be POD leaders.  *Id. at p. 71, ll. 6-21.*  And, in response to questioning

about the PODs, Russell testified:

Q     Okay.  And then you say, if they wrote more prescriptions, they

      received more Daiichi money?

A     They would be offered more PODs.

Q     Okay.  They didn't get a bonus for writing any prescriptions?

A     They were given more PODs to have and, therefore, more money.

Q     They were asked to do more PODs?

A     That would be correct.

32

*Id. at p. 185, ll. 2-11.*

The Court concludes that Russell's testimony gives rise to an inference, that the Court must draw in Russell's favor as the nonmoving party, supporting her theory that POD programs fall within MCA § 37-2-102(3)'s prohibition against a drug company promising to pay a medical practitioner "valuable consideration for, on account of, or based upon the volume of ... sales ... of drugs manufactured, processed, packaged, or distributed by the company."  Because of this conclusion, the Court, on the current record, cannot determine as a matter of law that Daiichi's POD programs did not violate MCA § 37-2-102(3), as Daiichi urges.

Second, respecting whether Russell's complaints to Leday that the PODs were "wrong" amounted to "reporting a violation of public policy" as contemplated in MCA § 39-2-904(1)(a), the Court concludes that fact issues preclude summary judgment.  "The WDEA's retaliatory discharge provision, § 39-2-904(1)(a), MCA, ... exists to protect the State's interest in enforcing State policies 'concerning the public health, safety, or welfare established by constitutional provision, statute, or

administrative rule.' " *Fenno v. Mountain West Bank*, 192 P.3d 224, 230 (Mont. 2008) (quoting MCA §39-2-903(7)) (reversing district court's entry of summary judgment for employer).  "[T]he WDEA protect[s] employees who take steps in their employment to promote the enforcement of laws and regulations." *Id.*  The WDEA protects a "good faith 'whistle blower[,]' ... regardless of whether the employee's report actually results in a citation or investigation [ – ] the test is whether the employee made the report in good faith." *Motarie v. Northern Montana Joint Refuse Disposal District*, 907 P.2d 154, 157 (Mont. 1995) (reversing district court's entry of summary judgment for employer).

Here, Russell testified at her deposition that Leday retaliated against her "[w]hen I started bringing to his attention that I felt the PODs were wrong." *Russell Depo. (Court Doc. 21-1) at p. 61, ll. 11-13.* She testified that she learned later that the PODs are "illegal," and that she believes she was directed to violate the law by being required "[t]o do the POD programs." *Id. at p. 199, ll. 10-20.*  In his deposition, Leday denied that Russell complained to him about the POD programs. *Leday Depo. (Court Doc. 21-2) at p. 129, ll. 6-9.*  Thus, a fact issue exists

34

respecting whether Russell reported her belief that the POD programs were wrong.

Daiichi argues, as noted above, that Russell did not "report" a public policy violation because she has not shown she intended to expose an illegality, and she told only her manager that she thought the POD programs were wrong.  The Court is not persuaded.  Nothing in the statute or in any binding decision requires either that the employee intend that a report expose an illegality or that the report be made to someone other than the employee's employer.  Rather, as noted above, this provision of the WDEA protects "employees who take steps in their employment to promote the enforcement of laws and regulations."  *Fenno*, 192 P.3d at  230.

Based on Russell's deposition testimony, a reasonable inference may be drawn that she reported her concerns about the PODs to her supervisor as a step to get her employer to comply with public policy as she understood it.  There is no requirement in the statute or case law that the employee must cite a specific law or regulation at the time the employee's reporting is made.  The WDEA does not require the

35

employee to have the legal skills to research illegality.

Accepting Daiichi's arguments would require the Court to alter the WDEA to require that reporting be made to someone other than the employee's employer and that the employee make the report with the intent to expose an illegality. But under Montana law, the Court may not alter the statute's language. Rather, the Court's role in construing a statute "is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." *Blehm v. St. John's Lutheran Hosp.*, 246 P.3d 1024, 1028 (Mont. 2010) (quoting MCA § 1-2-101 and citing *Miller v. District Court*, 162 P.3d 121, ¶ 38 (Mont. 2007)).

For the foregoing reasons, the Court will deny Daiichi's motion to the extent it seeks summary judgment in Daiichi's favor on Russell's retaliation claim.

Respecting Russell's claim that Daiichi lacked good cause to fire her, the Court similarly concludes that genuine issues of material fact preclude summary judgment. As noted above, Daiichi has argued and presented evidence that Russell's job performance became increasingly

unsatisfactory over time.  She failed to comply with recommendations for improvement such as reviewing training materials, her test scores were low, and her rankings as a pharmaceutical sales representative were low both regionally and nationally.  *Court Doc. 20 at 11-18*.

On the other hand, Russell points to evidence of record that she did review and "study thoroughly" the training materials as she was instructed, *Russell Depo. (Court Doc. 21-1) at p. 63, ll. 12-25, p. 64, ll. 1-22*; she received a more positive performance review after a field visit from Leday as late as January 2010, *id. at p. 137, ll. 22-25, p. 138, ll. 1-2, Court Doc. 21-13 at 1-2 (Field Contact Report dated "27/28 Jan 10")*; and, she ranked 49th out of 500 for one of her drugs in a "quarter-to-date" ranking in March 2010, *Court Doc. 21-1 at p. 155, ll. 16-22, Court Doc. 21-15 (FCR Report) at 1*.  This evidence, coupled with the above conclusion respecting Russell's claim that her termination was in retaliation for reporting a public policy violation, construed in Russell's favor as the nonmoving party, creates an issue of fact regarding "good cause" that a jury must resolve.  Thus, the Court must deny Daiichi's summary judgment motion.

III.   **<u>CONCLUSION</u>**

Based on the foregoing, **IT IS ORDERED** that Daiichi's Motion for Summary Judgment (*Court Doc. 19*) is DENIED.  The Court will address pending motions in limine by separate Order.

DATED this 15th day of May, 2012.

<u>/S/ Carolyn S. Ostby</u>
United States Magistrate Judge